UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:13 CR 77 HEA / DDN |
| | ) | |
| JACOB OLSON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER AND RECOMMENDATION

This action is before the court upon the motions of defendant Jacob Olson to suppress evidence (Docs. 16 oral, 21) and upon the motion of the United States for a determination of the admissibility of any arguably suppressible evidence (Doc. 17 oral).        On May 2, 2013, both parties agreed to submit the suppression issues upon the state court hearing transcript[1] in a related state court case.  (Doc. 27.)  At their request, the parties were given an opportunity to file memoranda in support of their positions.  The court has kept open the evidentiary record until the conclusion of the briefing.  (Id.)        Because the suppression issues include evidence seized in the execution of three search warrants, and because the parties had not provided the court with the search warrants and the underlying affidavits, the court ordered the parties to submit those documents for consideration.  That was done on June 7, 2013.  (Doc. 35.)

Defendant Jacob Olson is charged by federal indictment with making false statements on July 26, 2010, on a PS form 1583, Application for Delivery of Mail Through Agent, in violation of 18 U.S.C. § 1001 (Count 1); with unlawful possession of false identity documents in order to facilitate a drug trafficking offense on July 28, 2011, in violation of 18 U.S.C. § 1028(a)(3) (Count 2); and with possession of the means of identification of another person on July 26, 2010, in violation of 18 U.S.C. § 1028A (Count 3).

From the transcript of the March 4 and 5, 2013, evidentiary hearing in the Circuit Court of the City of St. Louis before the Honorable Robin R. Vannoy in the case of State v. Jacob Olson, Cause No. 1222-CR02501, and from consideration of the three search warrants and affidavits, the undersigned makes the following findings of fact and conclusions of law:

---

[1]This court was advised by counsel that the proceedings reported in this transcript were a combination of a hearing on defendant Olson's motion to suppress and a non-jury trial on the merits of the state's criminal charges against Olson.  The court has not been advised of the outcome of those proceedings.

## FACTS

### The traffic stop

1.     On a warm Sunday evening, July 21, 2011, around 7:00 p.m., St. Louis Police Det. Kyle Chandler and his partner Det. Ronald Vaughan were on automobile patrol with the police Special Operations Unit in the Fairgrounds Park area in the City of St. Louis.   They were part of what the police called "the Fairgrounds Park cruising detail."  This detail was formed because on Sunday evenings large crowds of people gather in Fairgrounds Park.[2]  A large number of people then drive their vehicles around the park, down Grand Avenue to Broadway, down Broadway to Lenore K. Sullivan St., and up to Hall Street.

2.     On July 21, Dets. Chandler and Vaughan were in their vehicle looking for traffic violations.  Near the intersection of Grand and Blair, they were a car length or two behind a small silver automobile with two white occupants, going northbound on Blair.  The silver automobile had a rear license plate that had a dark plastic cover. The dark cover  made it difficult for the officers to read the license number from their vehicle until they got to within one car length.   The officers believed that having a license plate with a cover that obstructs or limits reading the license number, while it does not make it impossible to read, is a violation of the traffic laws.   For this reason, and not the race of the occupants of the car,[3] the officers activated their emergency lights to conduct a traffic stop.

3.     The silver automobile pulled over within a quarter of a mile and stopped, after the police lights went on.  Det. Chandler stopped the police vehicle, got out, and walked to the driver's side of the vehicle.  Det. Vaughan stood and remained at the rear of the subject car to protect Det. Chandler.  When he walked up to the silver automobile, Det. Chandler looked through the windows and saw a white female driver and a white male passenger in the front seat.  Det. Chandler told the driver that he was conducting a traffic stop and he asked for her driver's license and insurance document.  She gave them to him.   Det. Chandler also asked the passenger to provide identification. The passenger said that he could only give him his name and date of birth and that he had no identification document.  He then gave the officer the name Anthony Kuhn and a date of birth.  The passenger also then told the officer that he probably had a couple of traffic warrants outstanding.

4.     Det. Chandler walked back to his car and ran the information through the computer.  He determined that the driver's identification and papers were in good order.  When Det. Chandler ran the passenger's information through the computer, the response was that there was no outstanding warrant for

---

[2]The officers knew that many African Americans live in the Fairgrounds Park area.

[3]The officers did not become suspicious of the car's occupants because they were white in a largely African American populated area, because the subject car had turned off Grand Ave. which is a common corridor for anyone leaving the nearby interstate highway.

Anthony Kuhn and provided a Department of Motor Vehicles (DMV) photo of this person.  Det. Chandler saw that the photo provided by the DMV was not that of the passenger.  Det. Chandler got out of the police car, advised Det. Vaughan of the report, and walked back to the passenger side of the silver vehicle.

5.      Det. Chandler then ordered the passenger to step out of the vehicle, which he did.  Det. Chandler then told the passenger that the name and date of birth he had provided were not his and that he knew he was lying.  The passenger admitted that he had given false information and that his real name was Jacob Olson and he gave the officer his correct date of birth.  With this information Det. Chandler returned to the police vehicle and ran the information through the computer a second time.

<u>Olson's arrest and seizure of items from his person</u>

6.      The second computer response provided a DMV photo of the passenger and information about many warrants for traffic tickets.  Det. Chandler walked back to the passenger and told Olson he was under arrest for the outstanding warrants.[4]  Olson was placed in handcuffs.  Det. Chandler then orally advised Olson of his constitutional rights to remain silent and to counsel,[5] reading them from his standard rights card.

7.      Next, pursuant to police procedure, the officer searched Olson for any weapons or narcotics, before putting him into the police vehicle.   In Olson's pocket, Det. Chandler found and seized 9 identification documents: a California driver's license in the name of Joshua Daniel Foster bearing a photo of Olson; a Texas driver's license in the name of Jay Aserton bearing a photo of Olson; a Social Security Card in the name of Joshua Daniel Foster; 2 Visa debit cards each bearing the name Joshua Foster; a Mastercard in the name Joshua Foster; 2 San Bernardino County library cards, one  in the name Joshua Foster and the other in the name Jay Aserton; and a money order receipt bearing the name Oleg Shcherbakov.  No weapon was found on Olson.

<u>Olson's post-arrest statements</u>

8.      After he found and seized these documents, Det. Chandler said to Olson, "Well, I have your ID right here."  Olson responded by saying it was his friend's ID and that he was taking it back to him.  Olson was then placed in the rear of the patrol car.  The officers did not have with them tools with which the driver could

---

[4]During the traffic stop, the officers had not seen the passenger commit any criminal act or make any suspicious move.

[5]Specifically, the officer told Olson:

You have the right to remain silent.  Anything you say can and will be used against you in court. You have the right to a lawyer and to have him with you while you are being questioned.  If you cannot afford to hire a lawyer, one will be appointed for you before any questioning if you so desire.

remove the cover then.  So, the officers gave the driver a warning to get the license cover removed and they let her drive away from the scene.  The officers never searched the silver vehicle.

9.      The officers then took Olson to the Central Patrol Division office.  There, Det. Chandler verified the outstanding warrants and booked Olson.  Det. Chandler then advised Det. Adrian York that they had arrested a subject with several identifications and he gave Det. York the seized materials.   Dets. Chandler and Vaughan then returned to their assigned duty.  Det. Chandler had no further contact with Olson that night.

10.     After he received the information and documents from Dets. Chandler and Vaughan, Det. York opened an investigation of Olson and the several identification documents.   Det. York initially determined that the documents were counterfeit.

11.     Next, later in the evening of July 21, Det. York interviewed Jacob Olson in the police station interview room.  At the beginning of the interview the officer orally advised Olson of his constitutional rights to remain silent and to counsel by reading them to Olson from his police rights card.  Olson understood his rights and so advised the officer.  Thereafter, Det. York asked Olson questions and Olson answered them.  Among the questions, Olson was asked for his residence address.  He gave an answer that Det. York later determined was false.  When asked whether anyone else made the false identification documents, Olson shook his head No. When asked if he had made the false documents, Olson said he wanted a lawyer.  At that point, Det. York stopped the interview.

12.     From Olson's aunt, Det. York determined that Olson lived at 300 North 4th St., Apt. 2217, in the City of St. Louis, an address different from the one Olson gave in the police station.  Through public records, the officer verified that Apartment 2217 was Olson's residence.

<u>The search warrant for the apartment</u>

13.     a.     Thereafter, on July 27, 2011, Det. York applied for a search warrant from the Circuit Court of the City of St. Louis for Apt. 2217 to search for "[f]orged documents, computers, printing equipment, and all related computer hardware and software."  (Doc. 35 at 2.)

        b.     The affidavit filed in support of this application stated that Jacob Olson was arrested on July 24, 2011, and was found to be in possession of 9 specifically described forged documents, in the name of Joshua Foster and Jay Aserton.  Further investigation of the name "Joshua Foster" and other names on several of the documents indicated that they were false identifications.  The affidavit stated that Olson was interviewed by the police and, after being advised of his rights, confirmed the falsity of the identifications.  The affidavit stated that Olson said no one else printed the false documents.  Further investigation established that Olson orally gave a false address of where he resided, and that he actually resided in Apartment 2217.  At his arrest, Olson said he was employed as a computer programmer.  Based on his investigation, Det. York stated his opinion that quantities of forged documents and equipment for manufacturing them were located in Apartment 2217 at 300 North 4th

Street, in the City of St. Louis, Olson's residence.  (Id. at 3-4.)

    c.  Thereafter, at 3:46 p.m. on July 27, 2011, Circuit Judge Timothy Wilson issued a search warrant for Apartment 2217 to search for forged documents, computers, printing equipment, and all related computer hardware and software.  (Id. at 5.)

  14. The warrant for Apartment 2218 was executed on July 28, 2011, following a briefing of the participating officers.  These officers included Dets. Chandler and Vaughan. Following the initial entry into Apt. 2217 by the special SWAT officers, Det. York and the other officers entered the apartment.  The SWAT officers found Nicole Brandt inside the apartment and escorted her outside the apartment into the hallway.  Among the items seized during the execution of the search warrant were:

a) a Dell Inspiron laptop computer with a printer; it was seized because the police knew that computers are generally used to manufacture false identification documents;

b) a canvas bag next to the computer; the bag contained

  i) a Polaroid ID maker and paper;

  ii) a quantity of printable clean edge business cards, which are used to manufacture fraudulent documents;

  iii) a box of photo paper which had been situated on top of the canvas bag;

  iv) a photo printing machine used as an identification document printer with paper inside it; and

  v) a laminating machine;

c) many fraudulent ID documents laying on the floor;

d) in the living room were seized books on how to avoid police detection, how to beat the system, how to manufacture narcotics, promoting drug usage, and avoiding surveillance;

e) a quantify of nitromethane racing fuel;

f) a canister of xylene;

g) a bucket containing a quantity of methanol;

h) a quantity of an unknown chemical in two glass beakers seized from the freezer;

i) a hotplate burner;

j) a quantity of yellow powder from the top of the refrigerator;

k) a quantity of spatulas from the kitchen;

l) drug paraphernalia from the stove;

m) a cooking plate;

n) a quantity of chemical implements, including glassware and funnels;

o) a pyrex dish with residue;

p) protective face masks;

q)      a chemistry set;

r)      glass tubing;

s)      a quantity of pool cleaner;

t)      a quantity of vacuum grease;

u)      two bottles of Methadone prescribed for Olson;

v)      a quantity of "Easy Whippets" drug material;

w)      a mechanic's vacuum pump;

x)      a PVC cutting device for making identification documents;

y)      a card die cutter instruction manual;

z)      a closed and locked safe discovered in a closet;

aa)     a notebook;

bb)     a copy of the apartment lease in Olson's name;

cc)     a pistol and ammunition inside a box; and

dd)     other items, including a Western Digital external computer hard drive.

(Id. at 6-8.)

        15.     During the execution of the search warrant, Det. Chandler became ill when another officer opened a bag in the residence and Chandler smelled fumes of an unknown chemical.  The officers inside the residence were alerted, emergency personnel, including the fire department and the police department's clandestine lab team, were dispatched.  The police officers evacuated the residence and Det. Chandler was taken to St. Louis University Hospital for treatment.  The remaining quantity of the substance (a quantity of Red Devil lye) that Det. Chandler smelled was seized.

        16.     The emergency teams placed the seized hazardous materials in a large drum and took it from the premises.  After several hours, the emergency teams cleared the residence and the investigating officers returned inside.

        17.     During the execution of the search warrant, after the emergency personnel had left the premises, Jacob Olson arrived at the residence.  He got off the elevator carrying a can of soda and a bag of fast food.  When he saw the officers on the floor of his apartment, he stopped and collapsed onto the floor.  Det. York and his partner, Lt. Banks took Olson into custody.  Officers handcuffed him and Olson defecated in his clothes.  The officers allowed him to enter the apartment to clean himself and put on fresh clothing.  After he was arrested Det. York orally advised him of his constitutional rights to remain silent and to counsel, which Olson understood.  After some questioning and answers by him, Olson asked for a lawyer.  He was not thereafter questioned.  The officers put him in a police vehicle and took him to the police station.  After he left, the officers continued searching the apartment.

<u>Warrantless search of safe</u>

18.      After the execution of the search warrant for Apartment 2217, without a warrant or anyone's consent, at the request of the police, the St. Louis Fire Department opened the safe, which had been seized from the apartment, for the investigating police officers.  The police seized the items found inside the safe.  These items included narcotics and suspected narcotics, drug paraphernalia, identification documents, a social security card, a Missouri driver's license in the name of Jacob Olson, a debit card in the name of Joshua Foster, and LSD paper.

19.      a.      After Apt. 2217 was searched pursuant to the warrant, and the items taken to the police headquarters, Det. York applied for and received separate warrants to search the Dell Inspiron laptop computer and related hardware, and to search the external computer hard drive that had been seized in the search of the apartment.

<u>The search warrant for the laptop computer</u>

b.      On August 2, 2011, Det. York applied to the Circuit Court of the City of St. Louis for a warrant for the Dell Inspiron laptop computer, a Cricket thumb drive, a SanDisk thumb drive, digital photo memory cards, and data CDR compact disks, which were stated to be then at 1200 Clark Avenue, St. Louis, MO 63107.  In support of his application, Det. York submitted his written, sworn affidavit.  In his affidavit he described the initiation of the investigation of Jacob Olson on "June 16, 2010" when Det. York was contacted by Officer Ronald Vaughan.  The affidavit stated that Vaughan told him that he had recovered several forged documents.  Officer Vaughan identified Jacob Olson as the suspect.  Det. York then stated that a search warrant had been executed at 300 N. 4th St., Apartment 2217 and that in the execution of the search warrant Det. York "located a computer belonging to suspect Jacob Olson" and a number of specified related items (a modem, thumb drives, digital photo cards, and data CDR compact disks).  The affidavit also stated that Nicole Brandt, Olson's girlfriend, who also resides in Apartment 2217, told the police that she had observed false identity photographs on the seized computer which belonged to Olson.  The affidavit described this computer as a Dell Inspiron 1501 with service tag number 1YKR5C1.  The affidavit then described the substantial usefulness of digital computer equipment, including related hardware and software, in manufacturing false identification documents.  The affidavit also described the methodology to be followed in the search of the computer.  (Doc. 35 at 11-14.)

c.      Upon this affidavit, on August 2, 2011,  Circuit Court Judge Elizabeth Hogan  issued a search warrant for the Dell Inspiron laptop computer, a Cricket thumb drive, a SanDisk thumb drive, digital photo memory cards, and data CDR compact disks, which were then at 1200 Clark Avenue, St. Louis, MO 63107.

(Id. at 15.)  A Return and Inventory relating to these items was filed on August 10, 2011.  This Return and Inventory document stated that "within ten days after issuance of said warrant, I went to the location and premises described therein as 300 N. 4th St., Apt. 2217, St. Louis, MO 63102 and that upon said premises I seized the [property that was described as the subject matter of the search warrant]."  (Id. at 16.)  Thereafter, the police analyzed the content of the computer.

<u>The search warrant for the external hard drive</u>

          d.          On August 11, 2011, Det. York applied for a search warrant for the Western Digital external hard drive, bearing serial number WCAV50138494, which had been seized in the search of Apartment 2217 on July 28, 2011.  The information in this affidavit repeated much of the information set out in the affidavit submitted for the issuance of the search warrant for the Dell Inspiron laptop computer.  The affidavit stated that the hard drive was seized, along with the computer and other related computer hardware, in the execution of the search warrant for Olson's apartment.  The affidavit also stated that Olson's girlfriend, who also lives in Apartment 2217, told the police she had seen false identity documents on the computer.  The affidavit also stated that the subject matter of the warrant was located at 1200 Clark Ave., St. Louis, MO 63107, and that the "computer system" contains records relating to the possession of forged documents, forging instruments, narcotics manufacturing, and the trafficking in stolen identities.  (Id. at 18-21.)  Thereafter, on August 11, 2011, Circuit Court Judge Barbara Peebles issued the search warrant for the Western Digital external hard drive and related data.  (Id. at 22.)  A Return and Inventory relating to these items was filed on August 11, 2011.  This Return and Inventory document stated that "within ten days after issuance of said warrant, I went to the location and premises described therein as 300 N. 4th St., Apt. 2217, St. Louis, MO 63102 and that upon said premises I seized the [property that was described as the subject matter of the search warrant]."  (Id. at 23.)  Thereafter, the police analyzed the contents of the hard drive.

          20.      All of the Return and Inventory documents were filed with the Missouri Circuit Court Clerk's Office.   None of them were submitted to the state Circuit Attorney's Office.   Each of the three returns and inventories contained the following paragraph:

> That I made this inventory in the presence of the person from whose possession I took said property (that there was no person present from whose possession said property was taken); that I delivered to such person a receipt of the property taken, together with a copy of this warrant, (that there were no persons in possession of said property present on said premises, I left a copy of this warrant with a receipt for the property taken, in a conspicuous place on the premises); that I have now placed said property so taken in the possession of this court.

(Doc. 35 at 6-9,16, 23.)  Det. York signed each of these Return and Inventory documents under oath.  Following the execution of the respective search warrants, Det. York did not make up the inventories in the presence of the person from whose possession he took the property; he did not deliver to Olson either a copy of the search

warrant or a receipt for any of the property seized; he did not leave any of the seized property with the issuing court; and he did not submit the Return and Inventory documents to the Circuit Attorney's Office.

## DISCUSSION

### The traffic stop

Defendant argues that the traffic stop was unlawful under the Fourth Amendment because it was "pretextual"[6] and was not supported by the Fourth Amendment. (Doc. 31 at 3, 6.)   More specifically he argues that the plastic cover on the rear license plate on the car in which he rode as a passenger complied with the law. Both the government and the defendant advert to § 301.130.5 RSMo as the basis in law for the officers to stop the car.  Section 301.130.5 provides in relevant part:

> Each such plate shall be securely fastened to the motor vehicle or trailer in a manner so that all parts thereof shall be plainly visible and reasonably clean so that the reflective qualities thereof are not impaired. Each such plate may be encased in a transparent cover so long as the plate is plainly visible and its reflective qualities are not impaired.

R.S.Mo. § 301.130.5 (2008).   Also, an ordinance of the City of St. Louis relates to the display of vehicular license plates.  Ordinance 17.52.300, Method of displaying license plates provides in relevant part:

> The required license plate(s) or temporary permit shall be fastened to a vehicle in such a manner as to be entirely unobscured, unobstructed, all parts thereof plainly visible and kept reasonably clean, fastened so that the letters or numerals are right side up and the plates do not swing. On all motor vehicles, one plate shall be displayed on the front and the other on the rear of such motor vehicle, not less than eight (8) or more than forty-eight (48) inches above the ground, except that on trailers, motorcycles and motor-driven cycles one plate shall be so displayed on the rear thereof. At nighttime, the rear plate shall be illuminated with a white light so as to be clearly visible from a distance of fifty (50) feet to the rear.

(Ord. 58900 § 4, 1983.) See http://www.slpl.lib.mo.us/cco/code/data/t1752.htm (last viewed on May 22, 2013). What the officers encountered was a license plate covered with a darkened, although translucent plastic cover. They initially could not read the license number due to the cover.  However, they were able to read it when they were within a car length from it.  The officers reasonably believed this degree of interference with the legibility of the plate violated the traffic laws.

This violation of the traffic laws authorized the officers under the Fourth Amendment to stop the vehicle.

---

[6]Defendant does not argue in his brief what the pretextual purpose was, only that the stated reason for the stop, that the legibility of the subject vehicle's rear license plate was limited by the dark plastic cover, was not in compliance with applicable law.

> An officer who observes a traffic violation, even a minor one, has probable cause to initiate a traffic stop. United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002). Once the officer makes the traffic stop, the officer may lawfully check the driver's license and registration, ask the driver about his destination and purpose, and request that the driver sit inside the patrol car. United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994) (en banc). The officer may also ask the passenger similar questions to verify the information the driver provided. Linkous, 285 F.3d at 719.

U.S. v. Brown, 345 F.3d 574, 578 (8th Cir. 2003). After stopping the car, Det. Chandler asked the driver for her license and insurance document. He also asked the passenger for his identification. This request for information was well within the scope of the traffic stop, which involved a vehicle having a license plate that was substantially illegible due to its dark cover. The driver gave the requested documents to the officer and he learned that her documentation was legitimate.

In response to the request for identification, the passenger, defendant Olson, made several statements seriatim: he had no identification document; he could give only his name and date of birth; he identified himself as Anthony Kuhn and gave a date of birth; and there were probably a couple of arrest warrants outstanding for him. Det. Chandler returned to the police vehicle and received computer information about both subjects. He learned that the driver's documentation was legitimate. But regarding passenger Olson, he learned that, while the given name of "Anthony Kuhn" had no outstanding arrest warrant, the Department of Motor Vehicle photo of Anthony Kuhn did not look like Olson. Det. Chandler returned to the passenger and told him that the name and date of birth the passenger had given was not him and that he knew the passenger was lying. Olson admitted providing false information, gave his real name as Jacob Olson, and gave his correct date of birth. With this information, from the computer Det. Chandler learned that passenger Olson indeed had many outstanding arrest warrants for traffic tickets.       If the information learned by the officer does not reasonably indicate more criminal activity than formed the basis for the stop, the officer may not expand the scope of the investigation.

> However, once an officer finishes [the investigation constitutionally authorized by the lawful traffic stop], the purpose of the traffic stop is complete and further detention of the driver or vehicle would be unreasonable, unless something that occurred during the traffic stop generated necessary reasonable suspicion to justify further detention or unless the continued encounter is consensual. Whether a particular detention is reasonable in length is a fact-intensive question. Reasonableness is measured in objective terms by examining the totality of the circumstances.

United States v. Quintero-Felix, 2013 WL 1810606, at *3 (8th Cir. 2013) (internal citations and quotation marks omitted). The oral information provided by the passenger, including that there were outstanding traffic-related arrest warrants for him, was enough by itself to warrant an extension of the traffic stop into an investigation of other criminal activity. While the officer did not initially find outstanding arrest warrants for "Anthony Kuhn," he found that the passenger had given him a false name for identification. When defendant gave Det. Chandler his true identification, the officer learned that indeed there were outstanding arrest warrants for him. Defendant

was then lawfully arrested on the outstanding arrest warrants.

The issuance and execution of the search warrants

Defendant argues that the search warrants for the apartment, the Dell Inspiron computer, and the Western Digital external hard drive, were not supported by legally sufficient facts for their issuance. This court's standard on review is different from the issuing court's standard for determining whether probable cause has been shown. However, the constitutional standard for finding probable cause or not remains the paramount touchstone for both courts. The Fourth Amendment to the Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. To secure these rights, the Fourth Amendment also provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Id.

The issuing court is guided by the constitutional definition of probable cause as a "'fair probability that contraband or evidence of a crime will be found in a particular place,' given the circumstances set forth in the affidavit." United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). The determination of whether probable cause exists must be based upon the totality of the relevant circumstances. Illinois v. Gates, 462 U.S. at 238. The issuing judge must make "a practical, common-sense decision whether given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," that probable cause exists. United States v. Coleman, 349 F.3d 1077, 1083 (8th Cir. 2003).

The issue before this reviewing court, however, when reviewing the legal sufficiency of the basis for the issuance of each of the three state court search warrants is whether Det. York's affidavits provided the respective Missouri Circuit Court Judge a substantial basis for concluding that probable cause existed for the issuance of the respective warrant. United States v. Luloff, 15 F.3d 763, 768 (8th Cir. 1994); United States v. Martin, 866 F.2d 972, 976 (8th Cir. 1989) (citing Illinois v. Gates, 462 U.S. at 238-39).

The apartment

Det. York's affidavit provided a substantial basis for Judge Wilson to find probable cause for the issuance of the warrant for the apartment. The affidavit described defendant Olson's arrest and possession of documents in the name of Joshua Foster and Jay Aserton, that defendant was not Joshua Foster, that the Aserton document and others were counterfeit, that defendant stated that he himself printed the false documents, that defendant gave a false address of where he resided, and that he actually resided in Apartment 2217. This information was a substantial basis for Judge Wilson to find probable cause.

-11-

The Dell Inspiron computer and the Western Digital external hard drive

Det. York prepared a new affidavit, which provided a substantial basis for Judge Hogan to issue a search warrant for the Dell Inspiron computer. The affidavit included the statement of defendant's girlfriend to the police that she had seen false identity photographs on the computer, which had been seized in the execution of the search warrant for defendant's apartment.

Similarly, Det. York's third affidavit provided Judge Peebles a substantial basis for the issuance of the search warrant for the external hard drive. This affidavit stated that the hard drive was seized along with the computer and other related computer hardware in the execution of the search warrant for defendant's apartment. The affidavit also stated that defendant's girlfriend told the police she had seen false identity documents on the computer. This information provided a substantial basis for the judge to find probable cause that the external hard drive also would contain evidence of criminal activity related to the underlying probable cause.

Defendant also argues that Det. York's sworn statements in his applications for the search warrants for the laptop computer and the external hard drive were incorrect about where those items to be seized were located when the applications were made. The applications stated the computer and the external hard drive then were in the police station, which defendant argues is different from his statements in the related search warrant returns in which Det. York stated these items had been seized from the apartment. The undersigned sees no substantial inconsistency in these statements. When the applications were made, the property was at the police station. This property had been seized from the apartment. Nothing in the comparison of these statements demeans the credibility of Det. York's state court hearing testimony.

Defendant also challenges the procedures followed by the police after the execution of the search warrants. Defendant argues that the police violated Missouri and federal law when the returns and inventories were submitted following the execution of the state court search warrants. Defendant invokes RSMo §§ 542.291.4 and 542.291.5 which provide:

> 4.      If any property is seized, the officer shall give to the person from whose possession it is taken, if he is present, a copy of the warrant and an itemized receipt of the property taken. If no person is present, the officer shall leave the copy and the receipt at the site of the search.

> 5.      A copy of the itemized receipt of any property taken shall be delivered to the office of the prosecuting attorney in the county where the property was taken within two working days of the search.

RSMo §§ 542.291.4, 542.291.5.

Defendant argues correctly that Det. York did not submit copies of the search warrant returns and inventories to the Prosecuting Attorney's office. Any such violation of state or local law, even if true, does "not warrant suppression of the evidence gained because federal courts in a federal prosecution do not suppress evidence that is seized by state officers in violation of state law, so long as the search complied with the Fourth Amendment."

-12-

United States v. Bach, 310 F.3d 1063, 1066 (8th Cir. 2002).  Defendant's additional argument that the police also did not comply with the requirements of Federal Rule of Criminal Procedure 41 is without merit, because Rule 41 did not apply to this entirely state court search warrant proceeding.  United States v. Kelley, 652 F.3d 915, 917 (8th Cir. 2011).

Defendant argues that the police unlawfully opened the safe that had been seized during the search of the apartment.  The undersigned disagrees.  "A search warrant authorizing the search of defined premises also authorizes the search of containers found on that premises which reasonably might conceal items listed in the warrant."  United States v. Johnson, 709 F.2d 515, 516 (8th Cir. 1983) (citing United States v. Ross, 456 U.S. 798, 820 (1982)(dictum); see also, United States v. Darr, 661 F.3d 375, 379 (8th Cir. 2011); United States v. Gamboa, 439 F.3d 796,  807 (8th Cir. 2006), and cases cited therein.  The police were authorized to open the safe without a new search warrant, because the items being searched for, which included forged documents, might be found in the previously discovered and seized safe.

Defendant cites United States v. Davis, 690 F.3d 226 (6th Cir. 2012), to show that it was not reasonable to believe the safe might be concealing the subject matter of the search warrant.  In Davis, Davis was taken to a hospital after being shot.  Davis' clothing had been removed by hospital attendants and put in a plastic hospital bag.  The attendants placed the bag on a shelf under the bed.  Police officers entered Davis' room and spoke with him.  Without any discussion, an officer took the bag of Davis' clothing from under the bed as potential evidence against Davis' assailant.  A sample of Davis' DNA was extracted from the clothing and placed in a police database. Sometime thereafter, police investigated a murder and entered DNA from a cap related to the murder.  A "cold hit" occurred between the DNA on the cap and the DNA on Davis' clothing.  During his subsequent prosecution for violent crimes in federal court, Davis challenged the DNA evidence offered against. him.  Both the District Court and the Fourth Circuit Court of Appeals agreed that the warrantless seizure of the plastic bag of Davis's clothing from under his hospital bed did not violate the Fourth amendment, because the bag was of obvious evidentiary value because the police could see his clothing in it.  690 F.3d at 232.

Defendant Olson argues that it was not as easy for the police to know what was in the locked safe in his apartment as it was for the police to know what was in the plastic bag under Davis' hospital bed.  That may be so.  But that is not the issue before this court.  Rather, what is at issue here is whether the circumstances, which included the facts described in the search warrant affidavit and the safe being found in the apartment with a plethora of criminal documentary evidence, made it reasonable to believe the safe contained such criminal evidence.  Clearly they did.

For these reasons,

**IT IS HEREBY RECOMMENDED** that the motions of defendant Jacob Olson to suppress evidence (Docs. 16 oral, 21) be denied.

**IT IS HEREBY ORDERED** that the motion of the United States for a determination of the admissibility of any arguably suppressible evidence (Doc. 17 oral) is denied as moot.

The parties are advised they have until not later than July 2, 2013 to file written objections to this Order and Recommendation.  The failure to file timely, written objections may waive the right to appeal issues of fact.


              /S/   David D. Noce
              **UNITED STATES MAGISTRATE JUDGE**

**Signed on June 13, 2013.**

-14-